# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **LARRY J. BAILEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO.: 1:09-CV-43** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Larry J. Bailey appeals to this Court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (Docket # 1.)  For the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Bailey applied for benefits on September 9, 2003, alleging that he became disabled as of February 18, 2003. (Tr. 17.)  The Commissioner denied his application initially and upon reconsideration, and Bailey requested an administrative hearing. (Tr. 17.)  Administrative Law Judge ("ALJ") Yvonne K. Stam conducted a hearing on November 7, 2006, at which Bailey, who was not represented by counsel; Ms. Terry Carrico, Bailey's case manager at Park Center mental health facility; Dr. Daniel Hauschild, a medical expert ("ME"); and Mr. Charlie McBee, a vocational expert ("VE"), testified. (Tr. 404-35.)

On July 5, 2007, the ALJ rendered an unfavorable decision to Bailey, concluding that he

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

was not disabled because he could perform his past relevant work. (Tr. 30.)  Bailey secured

counsel following the ALJ's decision and filed a Request for Review with the Appeals Council.

(Tr. 8-13.)  The Appeals Council, however, denied Bailey's request, making the ALJ's decision

the final decision of the Commissioner. (Tr. 5-7.)  Bailey filed a complaint with this Court on

February 18, 2009, seeking relief from the Commissioner's final decision. (Docket # 1.)  On

appeal, Bailey argues that the ALJ improperly evaluated the medical opinion of Dr. Hauschild

when she failed to provide Dr. Hauschild with additional medical records that allegedly

supported his claim of disability. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R.

7.3 ("Br.") 17-18.)  Bailey also claims that the ALJ improperly evaluated the credibility of his

symptom testimony. (Br. 18-21.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background

Bailey was born on August 14, 1959, and was forty seven years old at the time of the

hearing. (Tr. 92.)  He had completed ninth grade and later obtained a GED. (Tr. 257.)  Bailey

had past relevant work as a rubber inspector, machine operator, general laborer, and mill worker.

(Br. 106, 432-33.)  Bailey alleges that he is disabled due to bipolar II disorder.[3] (Br. 2.)

### B.  Summary of Relevant Medical Evidence

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 400-page administrative record necessary to the decision.

[3] "Bipolar disorder is a disease of the nervous system that involves the brain and the body. . . . 'Bipolar' refers to the two psychological states of mania and depression that are associated with the illness. . . . Although many people with this disorder may have mainly manic or mainly depressive episodes, there is usually a mixture of symptoms at any given time. . . ." WES BURGESS, THE BIPOLAR HANDBOOK 1-2 (2000).

On April 10, 2000, Bailey was evaluated by Dr. Christopher Shim, a psychiatrist, and Ann Flaningam, a mental health counselor, at the Caylor-Nickel Clinic. (Tr. 198-99.) Bailey was diagnosed with major depression and intermittent explosive disorder. (Tr. 198.) Dr. Shim assigned Bailey a Global Assessment of Functioning ("GAF") Score of 52, prescribed Depakote and recommended psychotherapy. (Tr. 198.)[4]

Bailey did not see Ms. Flaningam again until July 6, 2000, after having cancelled several appointments. (Tr. 195-96.) He and his wife reported that he had not been taking his medication and felt much more irritable as a result. (Tr. 195-96.) Two weeks later, Bailey told his doctor that he was faithfully taking his medication and felt less irritable and was controlling his anger. (Tr. 193-94.) In August and October of 2000, Bailey and his wife again reported that he was not faithfully taking his medication and his condition had declined as a result. (Tr. 191-92.)

On December 1, 2000, Bailey met with Ms. Flaningam and reported that he felt depressed because of his marital problems. (Tr. 184-85.) He said he otherwise felt stable, had no racing thoughts, had control of his temper, and was taking his medication. (Tr. 184-85.) Two weeks later, Bailey saw saw Dr. Shim and reported that his medication had improved his depression. (Tr. 184.)

On February 19, 2001, Bailey was admitted to the Caylor-Nickel Clinic with depression and suicidal ideation. (Tr. 179.) He was examined by Dr. Pekkakuzhiyil Mathew, who diagnosed him with major depression and instructed him to continue taking his medication. (Tr. 179-81.) Bailey was hospitalized at the Bluffton Regional Medical Center after attempting to

---

[4]A GAF score measures a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning. *See* DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS - Text Revision 32 (4th ed. 2000). The higher the GAF score, the better the individual's psychological, social, and occupational functioning. A GAF score of 50 is indicative of an individual who has serious symptoms or any serious impairments in social, occupational, or school functioning.

overdose on anti-depressants after he had a fight with his wife. (Tr. 173.) He reported to Dr. Sim that he had suicidal thoughts, but that his paranoid thoughts had lessened while he was taking his medication. (Tr. 174.) Dr. Shim found that he showed a fair memory, had limited insight, judgment, and concentration and diagnosed him with major depression. (Tr. 174.) Dr. Shim assigned Bailey a GAF Score of 18 on intake (the record does not reflect his GAF Score on discharge) and recommended that he be admitted to the hospital's psychiatric unit. (Tr. 175.)

Bailey did not seek any further treatment at the Caylor-Nickel Clinic after September 11, 2001, and did not seek any further medical treatment until May 16, 2003. (Tr. 182, 206.) On that date, Bailey went to the emergency room at the Marion General Hospital, complaining of depression and insomnia. (Tr. 206.) He noted that he and his wife had recently divorced and that he had stopped taking his medication because of financial reasons. (Tr. 208-14.) Bailey was prescribed Celexa and referred to the Cornerstone Clinic at the Marion General Hospital for further evaluation. (Tr. 207.)

On May 20, 2003, Bailey was evaluated at the Cornerstone Clinic by Dr. James Manshardt. (Tr. 287-90.) Bailey stated that he felt irritable, had a loss of appetite, and suffered from insomnia. (Tr. 287.) Dr. Manshardt made a diagnosis of bipolar II disorder, assigned a GAF Score of 45, and prescribed Depakote. During a later follow-up visit, Bailey reported that Depakote had improved his symptoms with no reported side effects. (Tr. 286.) He failed to show up for his next appointment on June 10, 2003, but his Depakote prescription was refilled over the telephone. (Tr. 286.)

Bailey was admitted again to the Cornerstone Clinic from June 16, 2003 to June 19, 2003 after indicating he had vague suicidal thoughts, insomnia, and loss of appetite. (Tr. 215-25.) Dr.

Jerry Co diagnosed him with bipolar II disorder, assigned a GAF Score of 50 upon discharge, and instructed Bailey to continue taking Depakote and return to the clinic as needed. (Tr. 215.) On July 10, 2003, Bailey went to the emergency room after punching a freezer during an argument with his sister-in-law. (Tr. 226-27.) He reported that he was not taking his medication and asked to be admitted to Cornerstone. (Tr. 227, 230-50.) When Bailey was discharged from Cornerstone on July 14, 2003, Dr. Cho modified his diagnosis to mood disorder, made a provisional diagnosis of alcohol abuse and nicotine dependence, and assigned a GAF Score of 50. (Tr. 231.)

On November 11, 2003, Dr. Ceola Berry performed a consultative mental examination of Bailey. (Tr. 256-58.) He reported that he was living with his mother, drank alcohol daily, and was currently taking Depakote, Risperdal, and Effexor. (Tr. 257.) Bailey told Dr. Berry that he had applied for disability benefits because he had an uncontrollable temper, felt worthless, anxious, and helpless, and did not like to be around people. (Tr. 257.) Dr. Berry diagnosed Bailey with dysthymia, alcohol-induced mood disorder, nicotine dependency, and caffeine-induced personality disorder. (Tr. 258.)

Bailey admitted himself into the Cornerstone Clinic for a third time on February 24, 2004, complaining of insomnia, loss of appetite, and suicidal thoughts. (Tr. 275-84.) He reported that he had not been taking his medications since October 2003 because he could not afford them and that his mental condition worsened as a result. (Tr. 275, 281.) Bailey was discharged on February 27, 2004, and Dr. James Driver diagnosed him with depressive disorder, alcohol abuse (in remission), and nicotine dependence. (Tr. 275-76.) He assigned Bailey a GAF Score of 55, prescribed Depakote and Risperdal, and scheduled him for a follow-up appointment

at the clinic. (Tr. 275-76.)

On February 25, 2004, Dr. F. Kladder completed a Psychiatric Technique Review Form and found that Bailey suffered from dysthymia, which was not severe and only mildly restricted his activities of daily living. (Tr. 260-74.) On April 26, 2005, Dr. D. Unversaw reviewed Bailey's medical history and affirmed Dr. Kladder's opinion. (Tr. 272.) On March 11, 2004, Dr. Gerson Escondo examined Bailey, noted he appeared to be stable with his current medication, and did not alter his previous diagnoses. (Tr. 285.) Bailey failed to appear for his follow-up and failed to reschedule. (Tr. 285.)

Bailey was brought to the Adams County Memorial Hospital by the police on May 17, 2004, after expressing suicidal thoughts during an argument with his ex-wife. (Tr. 291-308.) Bailey was voluntarily admitted to the hospital's Behavioral Health Unit for one week. (Tr. 291-94.) Bailey was evaluated by Dr. Houshmand Rezvani, who diagnosed him with impulse control disorder, assigned a GAF Score of 50, prescribed Lithium and Zoloft, and referred him to Park Center for counseling. Dr. Rezvani noted that Bailey said he would be unable to pay the $3.00 Medicaid co-payment for his medications. (Tr. 298.) Dr. Rezvani noted that Bailey showed no motivation to secure employment and that he preferred to have "others do everything for him and put responsibility on them." (Tr. 298.)

On July 3, 2004, Bailey was again brought by the police to the Adams County Memorial Hospital after expressing suicidal ideation and was voluntarily admitted to the Behavioral Health Unit for five days. (Tr. 323-38.) Bailey stated that he was compliant with his medications and responding well, but that stress from his ex-wife and family had led him to contact the police after contemplating an overdose on his Lithium. (Tr. 323.) Upon discharge Dr. Rezvani

maintained his diagnosis of impulse control disorder, increased Bailey's GAF Score to 55, prescribed Lithium, Zoloft, and Seroquel, and referred him to Park Center for counseling. (Tr. 326-27.)

Bailey did not seek any further mental health treatment until July 7, 2005, when he met with a social worker at Park Center. (Tr. 374.) The social worker found that without case management, medication, therapy, and placement in a group home, Bailey ran the risk of "imminent imprisonment" or of harming himself or others. (Tr. 381.) On August 19, 2005, another social worker at Park Center, Thomas Weir, diagnosed Bailey with major depressive disorder and assigned him a GAF Score of 45. (Tr. 368-69.)

On September 16, 2005, Tanya Black, one of Bailey's case managers at Park Center, diagnosed him with major depression and noted his GAF Score of 45. (Tr. 361.) She reported that he was compliant with his medication and treatment, that his mood was slightly depressed, and that he displayed good judgment, coherent thought processes, and normal speech. (Tr. 361-67.) On January 5, 2006, Ms. Black noted that Bailey had obtained a part-time job that he was enjoying. (Tr. 358-59.) She also reported that Bailey was taking Zoloft, Lithium, and Trazadone and was demonstrating good self-management skills. (Tr. 359.)

On June 27, 2006, Terrie Carrico, one of Bailey's case managers at Park Center, conducted an annual assessment and treatment plan. She diagnosed Bailey with major depressive disorder and noted his GAF Score of 45. (Tr. 347-54.) She found that Bailey required coaching to manage his finances, benefits, and personal grooming. (Tr. 353.) In a later addendum to the report, Thoms Weir again diagnosed Bailey with major depressive disorder and assigned a GAF Score of 45. (Tr. 345-46.) On September 22, 2006, Ms. Black noted that Bailey

had responded well to his medications and was complaint with his treatment. (Tr. 340-42.)  She

also found him to be functioning independently in all areas and demonstrating good self-

management and coping skills. (Tr. 340-42.)

### C. Bailey's Hearing Testimony

On November 7, 2006, Bailey appeared without counsel and testified before the ALJ. (Tr.

404-35.)  Prior to Bailey beginning his testimony, the ALJ repeatedly advised him of his right to

have counsel present and noted several options for securing representation. (Tr. 406-7.)  Bailey

testified that since his alleged onset date of February, 18, 2003, he has only held part-time

employment through a program with the Carriage House mental illness center. (Tr. 411.)  He

testified that after the temporary placements concluded he tried three times to secure permanent

employment, but was unsuccessful. (Tr. 412.)  He said that he suffered from violent outbursts

during the night and he feared that he might have one during the day. (Tr. 411-13.)  Bailey

testified that he also frequently called in sick to jobs as an excuse not to have to work. (Tr. 413.)

However, he also testified that apart from not wanting to work, there was nothing keeping him

from working. (Tr. 413-14.)  The ALJ then questioned Bailey about his work experience and

Bailey recounted the various jobs he had held. (Tr. 414-18.)  He testified that he felt he could

currently return to his past work as a parts inspector. (Tr. 416.)

Ms. Terry Carico, Bailey's case manager at Park Center, also testified.  She discussed

Bailey's treatment history and his efforts at living independently. (Tr. 419-22.)  Ms. Carico

testified that while Bailey was participating in the Park Center group home she primarily helped

him develop his interpersonal skills, money management ability, and personal hygiene. (Tr. 422.)

The ALJ then questioned the ME, Dr. Hauschild, who stated that he had reviewed

Bailey's medical records from 2000 to March 2004 and that they were sufficient to make a judgment about his condition during that time period. (Tr. 423-24.) He believed that the diagnosis of bipolar II disorder was supported by the medical evidence. (423-24.) The ME ultimately concluded that if Bailey were to faithfully take his medicine and remove himself from his stressful family relationships he could perform work that is low demand in terms of pace and contact with others. (Tr. 428-29.) The ALJ also told the ME that she would obtain some of Bailey's more recent medical records from Park Center and forward them to him for review to determine whether they altered his determinations. (Tr. 434.)

Finally, Mr. Charles McBee, the VE, testified and began by summarizing Bailey's past relevant work. (Tr. 433-34.) The VE discussed the levels of stress and physical exertion that accompanied each job in relation to Bailey's work limitations of no public contact and no fast pace. (Tr. 432-34.) He testified that Bailey's former job as a mill operator would not have to be performed at an unacceptably fast pace. (Tr. 432.) He also testified that Bailey's previous job as an inspector of small parts is not normally fast-paced nor does it involve contact with a large number of other people. (Tr. 434.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th

Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. §

404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. *The ALJ's Decision*

On April 18, 2008, the ALJ rendered her opinion. (Tr. 14-31.) She found at step one of the five-step analysis that Bailey had not engaged in substantial gainful activity since his alleged onset date of February 18, 2003. (Tr. 19.) At step two, she determined that Bailey's bipolar disorder qualified as a severe impairment. (Tr. 19.) At step three, she determined that Bailey's impairment was not severe enough to meet a listing. (Tr. 19.) The ALJ also found that Bailey's disability allegations and testimony were not reliable. (Tr. 29-30.) Additionally, the ALJ determined that Bailey's Residual Functional Capacity ("RFC") would allow him to perform his past relevant work as an inspector of small parts or a mill operator. (Tr. 30.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Bailey could return to his past relevant work as an inspector of small parts and as a machine operator II. (Tr. 30.) She therefore concluded at step five that Bailey was not under a disability at any time

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

from the alleged onset date through the date of the decision and his claim for benefits was denied. (Tr. 30.)

### C. The ALJ Did Not Err in Evaluating the Medical Opinion of Dr. Daniel Hauschild

Bailey argues that the ALJ improperly evaluated the opinion of the ME, Dr. Daniel Hauschild. (Br. 17.)  In her opinion, the ALJ found that the ME's testimony supported her RFC determination that Bailey's only limitations were an inability to perform work that required fast pace production or contact with the general public. (Tr. 19, 29.)  Bailey, however, argues that the ALJ impermissibly based this finding on her own medical judgment. (Br. 17.)  During the hearing, the ALJ noted that she did not have Bailey's current medical records from Park Center. (Tr. 426.)  However, the ME was still able to give the ALJ his evaluation of Bailey based on the records available to him during the hearing.  At the conclusion of the hearing the ALJ told Bailey that:

> ALJ: All right, Mr. Bailey, it looks like what we need to do is get the remains of those Park Center records and then Dr. Hauschild can tell us whether his opinion continues through that period of time and then I can make a decision at that point.
>
> CLMT: All right.
>
> ALJ: That will give you some time and so while we look for that if you choose to seek representation then we can look into having a supplemental hearing if thats what you decide to do but right now we'll just look at those Park Center records, send them to Dr. Hauschild to see if that changes his opinion in any way --

(Tr. 434.)

Bailey bases his argument on the ALJ's promise to him during the hearing to obtain his recent medical records from Park Center and provide them to Dr. Hauschild.  "The record does not indicate that [the ALJ ever sent the records to the ME]; thus, apparently the ALJ has drawn her own conclusions from the additional medical records." (Br. 18.)  Presumably, Bailey means

that the ALJ was legally required to re-contact the ME and that since the Park Center records would have allegedly altered the ME's opinion, the ALJ committed error by only reviewing the additional records herself in making her disability determination.

The claimant has the burden of proving disability, and "must furnish medical and other evidence that [the administration] can use to reach conclusions about [the claimant's] medical impairment(s) and . . . its effect on [his] ability to work on a sustained basis." 20 C.F.R. § 404.1512(a). The ALJ has discretion to consult a medical expert, but is certainly not required to do so. 20 C.F.R. § 404.1527(f)(2)(iii) ("Administrative law judges may also ask for and consider opinions from medical experts . . . ). Medical experts are considered non-examining medical sources, 20 C.F.R. § 404.1502, and their testimony is evaluated as opinion evidence. 20 C.F.R. § 404.1527(f)(2)(iii).

An ALJ might need to re-contact a medical source "[w]hen the evidence we receive . . . is inadequate for us to determine whether you are disabled . . .." 20 C.F.R. § 404.1512(e); *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009) (the ALJ must re-contact a medical source if the evidence is not readily discernable); *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) ("An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable."); *cf. Skinner v. Astrue*, 478 F.3d 836, 843 (7th Cir. 2007) ("ALJs may contact treating physicians for further information when the information already in the record is 'inadequate' to make a determination of disability. . .").

Bailey's argument that the ALJ was legally required to forward the Park Center records to the ME to solicit his opinion is not a correct statement of the law. An ALJ is never required to solicit the opinion of a medical expert. 20 C.F.R. § 404.1527(f)(2)(iii) ("Administrative law

judges *may* also ask for and consider opinions from medical experts on the nature and severity of your impairment(s).") (emphasis added).  Furthermore, Bailey admits that he cannot point to any regulations or case law that unequivocally require the ALJ, after exercising her discretion to retain the medical expert, to then automatically re-contact the ME to have him evaluate additional evidence. (Reply Br. 1.)

Rather, 20 C.F.R. § 404.1512(e) and Seventh Circuit case law clearly leave it to the discretion of the ALJ to re-contact the medical source "[w]hen the evidence we receive . . . is inadequate for us to determine whether you are disabled. . ." *Similia*, 573 F.3d at 516; *Skinner*, 478 F.3d at 843; *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("An ALJ need re-contact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled."); *Graffice v. Astrue*, No. 08-cv-528, 2009 WL 959394, at *10 (W.D. Wis. Apr. 7, 2009) ("An administrative law judge does not need to recontact a medical source or call a medical expert unless he is unable to determine whether the claimant is disabled.").  Indeed, Bailey ultimately concedes in his Reply Brief that the Social Security regulations and case law did not require the ALJ to re-contact the ME and provide him with the Park Center records. (Reply Br. 1.)

Bailey attempts to obfuscate the fact that the ALJ was not required to re-contact the ME by arguing that the ALJ committed error by drawing her own conclusions from the Park Center records, instead of apparently relying exclusively on the ME.  Bailey seems to infer that the ALJ automatically "played doctor" by even reviewing the records and exercising her statutory discretion to not re-contact the ME.

In his Reply Brief, Bailey eventually discusses the substance of the Park Center records

in an effort to suggest that there was unclear evidence that would require the ALJ to re-contact the ME. For example, "[o]n four occasions the new records indicated that his current GAF was 45 (Tr. 345, 347, 361, and 368)." (Reply Br. 2.) He points to a July 15, 2005, Treatment Plan Review in which it was noted that, although Bailey was compliant with his treatment regime, he was being transferred to a group home to help him stay out of trouble. (Tr. 370.) During Bailey's September 15, 2005, Annual Assessment, the reviewer noted that he displayed withdrawn behavior and that his mood and affect were slightly depressed and blunted. (Tr. 365.) Bailey also points out that in his June 27, 2006, Treatment Plan, he was described as experiencing periods of depression and needing help in maintaining personal hygiene, although he does acknowledge that he had developed improved insight and was successfully managing his household responsibilities while living in the Park Center satellite apartment. (Tr. 347.)

Despite what Bailey may wish, evaluating and assigning persuasive weight to evidence is the exact function that an administrative law judge performs during the disability hearing. Regarding the opinions of non-examining sources, "[a]dministrative law judges are responsible for reviewing the evidence and making findings of fact and conclusions of law." 20 C.F.R. § 404.1527(f)(2); *see* 20 C.F.R. § 404.1527(d)(3); *Similia*, 573 F.3d at 516 ("An ALJ is entitled to evaluate the evidence and explanations that support a medical source's findings."). An ALJ is only required to re-contact a medical source if the evidence received is inadequate to determine whether the claimant is disabled. *Skinner*, 478 F.3d at 843; *Skarbek*, 390 F.3d at 504; *Graffice*, 2009 WL 959394, at *10.

A review of the ALJ's opinion reveals that she considered the Park Center records and apparently found the evidence adequate to make her determination that Bailey was not disabled

without re-contacting the ME. The ALJ devoted almost an entire single-spaced page to discussing the Park Center records in her report, discussing Bailey's treatment history there in depth. (Tr. 27-28.) For example, the ALJ noted that during his June 2006 review, Bailey was described as reliable, intelligent, and personable. (Tr. 28.) The ALJ also noted that during the same review, Bailey's doctors found that although he remained guarded, he had developed improved insight, was currently living successfully in a satellite apartment, managed his household responsibilities well, and was successfully performing a part-time job. (Tr. 28.) In fact, during his September 2006 review, Bailey's limitations were listed in part as: "The client currently has no income. Social Security is pending. Larry is currently on probation, and owes [a] $185 probation fee to the court." (Tr. 347.) When asked about his goals for overcoming his "Independent Living Skills Deficit" Bailey's response was: "Get my disability." (Tr. 349.)

Since Bailey can point to no regulations or case law that require the ALJ to re-contact the ME, his argument ultimately seems to be that he simply does not agree with the conclusions that the ALJ made from the Park Center records. If an ALJ's determination is grounded in the record and she articulates her analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), her determination will be upheld unless it is "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). In the present case, the ALJ obtained the Park Center records, examined them, and felt that it was not necessary to re-contact the ME because the records were adequate to make her disability determination. The Court will not accept Bailey's invitation to remand the case in the mere hope that the same

evidence will be viewed in a more favorable light. *See Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 447 (7th Cir. 2004); SSR 96-7p.

With regards to Bailey's second argument, the ALJ does have a responsibility to adequately develop the record when a claimant is unrepresented. *Skinner,* 478 F.3d at 841-42 (the ALJ must "scrupulously and conscientiously probe into, inquire of and explore for all the relevant facts") (citation omitted); *see also Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997); *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994). Bailey offers no suggestion that the ALJ failed to obtain a valid waiver of counsel[6] or that she failed to adequately develop the record. Rather, he simply claims that the ALJ owed him a "special duty", and summarily cites *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988) in support.

Bailey grossly misstates the facts and holding in *Sears*. In that case, the claimant specifically argued that the ALJ had failed to adequately develop the record. *Sears*, 840 F.2d at 401-2. The Court of Appeals did not, as Bailey suggests, adopt the rule that an ALJ owes any sort of general "duty" to an unrepresented, mentally ill claimant apart from the existing duty to secure a valid waiver of counsel and adequately develop the record.[7] Bailey has not suggested that the ALJ failed to adequately develop the record or obtain a valid waiver of counsel, but rather that she was simply required to re-contact the ME and obtain further evidence from him. As previously discussed, however, this is not the law.

In any event, there is ample evidence that the ALJ did adequately develop the record and

---

[6] "To ensure valid waivers, ALJs must explain to pro se claimants '(1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of the fees.'" *Skinner*, 478 F.3d at 841 (citations omitted).

[7] Bailey apparently laches on to this one sentence in the opinion: "There is no dispute that the Secretary has a duty to fully and fairly develop the record." *Sears*, 840 F.2d at 402.

secure a valid waiver of counsel. The hearing transcript indicates that the ALJ followed the three step process for obtaining a valid waiver of counsel. (Tr. 406-7.) Additionally, on December 20, 2006, the ALJ sent a letter to Bailey informing him that she had obtained the evidence from Park Center in Fort Wayne and enclosed copies of the records. (Tr. 389.) She also told Bailey that she had attempted to obtain records from Dr. George Merkle and the Park Center facility in Bluffton, Indiana. (Tr. 389.) She informed Bailey that he could comment on the records and provide a written statement on the law and facts he believed applied to his case in light of the records, but apparently he failed to do so. Consequently, Bailey's first argument fails to warrant a remand of the Commissioner's decision.

### D. The ALJ's Credibility Determination Will Not Be Disturbed.

Bailey also asserts that the ALJ erred when evaluating the credibility of his symptom testimony. (Br. 18.) The ALJ discredited Bailey's symptom testimony because of his failure to regularly seek treatment, his successful part-time work in 2006, significant improvement in his condition when on medication, and his demeanor at the hearing. (Tr. 18-19.)

Because the ALJ is in the best position to evaluate the credibility of a witness, her determination is entitled to special deference. *Powers*, 207 F.3d at 435. If an ALJ's determination is grounded in the record and she articulates her analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo*, 458 F.3d at 584, her determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was

based on "serious errors in reasoning rather than merely the demeanor of the witness . . .").

The ALJ specifically took note of Bailey's credibility throughout her decision and devoted almost one full page to the question. (Tr. 29-30.) She recounted Bailey's medical history in depth, noting his symptom complaints and eventual diagnosis. (Tr. 20-30.) She also discussed Bailey's hearing testimony, stating, for example: "He was just recently diagnosed as having PTSD, bipolar disorder, and major depression. He was unable to work because he calls in sick or says he's in jail or something in order to avoid going to work." (Tr. 28.) The ALJ also took special note of Bailey's testimony during the hearing that "[o]ther than simply not wanting to go to work, he 'can't think of anything' that would prevent him from holding a job." (Tr. 28.)

The ALJ ultimately did not find Bailey's testimony credible. She concluded that:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely persuasive.
>
> The claimant's statements regarding his impairments and their effect on his ability to perform substantial gainful activity cannot be considered fully persuasive in view of the discrepancies among such statements over time, the discrepancies between such statements and the documented medical evidence of record, and the claimant's demeanor at the hearing. For example, although the claimant alleges long-standing severe, disabling mental impairments, the record shows that the claimant's impairments consistently improve significantly when he is compliant with prescribed treatment; the record documents no medical treatment of any sort from September 11, 2001 to May 16, 2003 and again from July 3, 2004 to July 7, 2005; and the record shows that the claimant successfully performed part-time work stocking shoes in 2006, enjoyed the work, and experienced no decompensation as a result of such work.
>
> No treating or examining physician or psychologist has opined that the claimant has impairment(s) that could reasonably be expected to preclude all substantial gainful activity throughout a period of at least 12 consecutive months despite appropriate treatment, and the record clearly does not support any such finding.

(Tr. 29.)

19

This discussion, however, does not deter Bailey from challenging the ALJ's reasoning. Bailey first argues that the ALJ erred in discrediting his testimony for failure to seek or pursue regular medical treatment "without first considering any explanations that [he] may provide or other information in the record that may explain infrequent or irregular visits or a failure to seek medical treatment." (Br. 20.) He next claims that although he did have brief success with part-time work in 2006, this was not evidence that he was able to work on a full-time basis. (Br. 20.) Bailey also argues that, "although [he] did improve significantly on medications, there is evidence that the ALJ did not consider that contradicts this finding." (Br. 21.) Specifically, he points to the GAF score of 45 assigned to him at Park Center and the Park Center treatment notes that indicated that he still experienced periods of depression. Finally, Bailey argues that "although the ALJ can permissibly support a credibility finding with demeanor evidence, that evidence only cannot support the credibility finding." (Br. 21.)

Bailey's arguments again fall short of warranting a remand. Contrary to Bailey's claim, the ALJ did consider his possible financial reasons for not consistently seeking treatment. On three occasions, the ALJ specifically noted Bailey's possible financial reasons for not regularly pursuing treatment. (Tr. 25-27.) The ALJ stated that "[Bailey] had not taken any medication since October of 2003 because he could not afford it." (Tr. 25.) The ALJ noted that Bailey was "not taking Depakote due to cost" (Tr. 26) and that he "strongly refused" to pay the $3.00 Medicaid co-pay. (Tr. 26.) The ALJ also twice discussed the fact that Bailey had lost his job and was unable to find work. (Tr. 26, 27.) Furthermore, the ALJ twice noted that Bailey received Medicaid. (Tr. 26, 27.)

Thus, while the ALJ was aware of Bailey's financial constraints, she was also faced with

an apparently persuasive medical history demonstrating that Bailey's condition was not actually as serious as he claimed. For example, the ALJ found that "[o]n April 7, 2006, [Bailey's Park Center counselor Tanya Black] noted that the claimant remained compliant with treatment; he appeared stable, maintained steady employment for the past 5-to-6 months, and functioned independently in all areas; and no medication adjustments were made at his most recent medication review." (Tr. 27.) The ALJ ultimately concluded that "[n]o treating or examining physician or psychologist has opined that the claimant has impairment(s) that could reasonably be expected to preclude all substantial gainful activity throughout a period of at least 12 consecutive months despite appropriate treatment, and the record clearly does not support any such finding." (Tr. 29.) Bailey's disagreement with the weight given by the ALJ to different pieces of evidence is not a basis for remand. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004); *Flener*, 361 F.3d at 447; *Powers*, 207 F.3d at 435. The ALJ's reasoning cannot be said to be "patently wrong," *Powers*, 207 F.3d at 435, and the Court will not re-weigh the evidence in the hope that it will come out in Bailey's favor this time. *See Flener*, 361 F.3d at 447; SSR 96-7p.

Bailey next argues that the ALJ erred in discrediting his testimony based on his successful part-time work in 2006. "[A]lthough he did have brief success for part-time work in 2006, this was scant evidence that he was able to work on a full-time basis." (Br. 20.) He argues that this part-time work was not substantial evidence on which the ALJ could base her credibility finding.

Bailey's argument is again unpersuasive, as the ALJ appropriately considered Bailey's part-time work in making her credibility determination. Specifically, the ALJ found that:

"[Bailey] has not performed substantial gainful activity since his alleged disability onset date. He did perform a transitional part-time job through Carriage House, which is a program that slowly tries to get people back into [the] workforce; he stocked women's shoes at T.J. Maxx for 5-to-6 months, but worked only about 8 hours per week during [the] last 4 months, and the job ended because the time allotted for his transitional program expired; he subsequently looked unsuccessfully for work at T.J. Maxx, Kohl's, and Kroger's; and he last looked for a job about a month earlier." (Tr. 28-29.)

Contrary to Bailey's insinuation, the ALJ did not base her disability finding exclusively on the fact that Bailey had successfully worked part-time. Rather, the ALJ saw his successful part-time work as one factor undercutting his claim of severe disability. (Tr. 29.) Specifically, the ALJ found that: "For example, although the claimant alleges long-standing severe, disabling mental impairments, the record shows that the claimant's impairments consistently improve significantly when he is compliant with prescribed treatment; the record documents no medical treatment of any sort from September 11, 2001 to May 16, 2003 and again from July 3, 2004 to July 7, 2005; and the record shows the claimant successfully performed part-time work stocking shoes in 2006, enjoyed the work, and experienced no decompensation as a result." (Tr. 29.) The ALJ considered that this work was part-time and was part of his treatment regime, but the ALJ also noted that Bailey was apparently successful enough with his transitional part-time employment that he looked (albeit unsuccessfully) for full-time employment at T.J. Maxx, Kohl's, and Kroger. (Tr. 29, 412.) Furthermore, during his hearing, Bailey ultimately testified that he "couldn't think of anything" other than not wanting to go to work that would prevent him from holding a job. (Tr. 413-14.)

Bailey does not cite any case law or statutes to support his argument that the ALJ committed legal error by considering his part-time work and efforts to secure full-time employment in making her credibility determination. Indeed, SSR 96-7p specifically directs the ALJ to consider a claimant's "prior work record and efforts to work" as part of the credibility determination. *See also Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("Although the diminished number of hours per week indicated that [the claimant] was not at his best, the fact that he could perform some work cuts against his claim that he was totally disabled."); *Hastings v. Astrue*, No. 08-cv-2190, 2009 WL 2601245, at *7 (C.D. Ill. Aug. 20, 2009) ("[P]art-time work after the alleged onset date of . . . disability contradicted . . . testimony about the severity of [claimant's] symptoms."); *Whetzel v. Astrue*, No. 1:07-cv-210, 2009 WL 537640, at *17 (N.D. Ind. Mar. 4, 2009) (concluding that the ALJ appropriately considered part-time work in making overall credibility determination).

Bailey's argument therefore appears to simply be that he disagrees with the weight given by the ALJ to his successful part-time work and efforts to secure full-time employment. However, the ALJ is in the best position to evaluate the credibility of a witness, and the Court gives special deference to her determination. *Powers,* 207 F.3d at 435. The ALJ's decision cannot be said to be "patently wrong" and the Court will not remand the case simply in hopes that a new ALJ will view the same evidence in a different light. *See Young*, 362 F.3d at 1001; *Flener*, 361 F.3d at 447; *Powers*, 207 F.3d at 435.

Bailey next attacks the ALJ's credibility determination by arguing that "although Bailey did improve significantly on medication, there is evidence that the ALJ did not consider that contradicts this finding." (Br. 21.) Specifically, Bailey alleges that because his Park Center

treatment notes indicated that he still experienced periods of depression and he was assigned a GAF Score of 45, the ALJ's credibility finding was not supported by substantial evidence. (Tr. 21.)

Bailey's argument is again unpersuasive. Although Bailey correctly points out that the ALJ did not specifically mention that his Park Center counselors noted in his treatment report that he continued to experience periods of depression and did not attend to self-care appropriately or note that he was assigned a GAF Score of 45 while at Park Center, her failure to do so is not reversible legal error. *Mobley-Butcher v. Astrue*, No. 1:06-cv-934, 2007 WL 3124478, at *11 (S.D. Ind. Sep. 6, 2007) ("Although the ALJ did not specifically mention [the claimant's] GAF scores or discuss every diagnosis, he was not required to do so."). "[A]n ALJ must articulate, at some minimum level, her analysis of the evidence. She is not required to address every piece of evidence or testimony, but must provide some glimpse into her reasoning." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir.2001) (citing *Zurawski v. Halter*, 245 F.3d 881, 888-89 (7th Cir. 2001); *Clifford*, 227 F.3d at 872.

Here, the ALJ's discussion of Bailey's medical history adequately articulates her reasoning to the necessary minimal level. The ALJ devoted eight pages to a thorough recounting of Bailey's medical history from April 10, 2000 to September 22, 2006. (Tr. 20-28.) She frequently noted Bailey's complaints of depression, stress, insomnia, and irritability. She noted Bailey's varying and inconsistent diagnoses of depressive disorder, bipolar disorder, intermittent explosive disorder, alcohol abuse, and nicotine abuse.

In discussing Bailey's specific treatment at Park Center, the ALJ noted that Bailey continued to be diagnosed with "recurrent major depression and antisocial personality disorder,

for which he is prescribed Lithium, Zoloft, trazodone and Trileptal." (Tr. 27, 28.)  Furthermore, the ALJ's opinion frequently noted Bailey's previous GAF Scores, which were largely in the range of the 45 GAF Score from Park Center. (Tr. 21, 23-27.)  The ALJ also apparently gave weight to the fact that Bailey was never actually treated by a doctor at Park Center.  "[H]e has been seen for medication management about every three months but has never seen a psychiatrist at Park Center, and has been maintained on the medications that he was prescribed at Adams County Memorial Hospital." (Tr. 28.)

The absence of these two pieces of information, which are entirely consistent with Bailey's previous medical history—indeed, the Park Center records viewed as a whole strongly suggest that Bailey's condition was much less serious than he claimed—does not mean that the ALJ's finding was not based on substantial evidence.  The ALJ has articulated her reasoning to the necessary minimal level, *Dixon*, 270 F.3d at 1176; *Clifford*, 227 F.3d at 872, and the Court will not remand the case in the hopes that a new ALJ will assign a different weight to the same evidence. *See Young*, 362 F.3d at 1001; *Flener*, 361 F.3d at 447; *Powers*, 207 F.3d at 435.

Lastly, Bailey argues that "although the ALJ can permissibly support a credibility finding with demeanor evidence under SSR 96-7p that evidence only cannot support the credibility finding." (Br. 21.)  Bailey's final argument is again unpersuasive.  The ALJ did not, as Bailey claims, base her credibility determination solely on his demeanor at the hearing.  Rather, as previously discussed in depth, she considered a variety of factors; primarily, the discrepancies between his statements regarding his impairments and their effect on his ability to perform substantial gainful activity and the documented medical evidence of record. (Tr. 29.)

Since the ALJ's decision is grounded in the record and she articulated her analysis of the

evidence "at least at a minimum level," *Ray*, 843 F.2d at 1002, her decision will not be disturbed. *See Stevenson v. Chater*, 105 F.3d 1151, 1155 (7th Cir. 1997) (stating that an ALJ is entitled to make reasonable inferences from the evidence of record). The ALJ drew "an accurate and logical bridge," *Ribaudo*, 458 F.3d at 584; *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000), between the substantial evidence in Bailey's medical history that his condition was not as debilitating as he claimed, his successful efforts at a transitional part-time job, his search for full-time employment, and his own statements that ultimately the only thing keeping him from working was his desire not to work, in finding that Bailey's testimony of a total inability to work was not entirely credible. (*See* Tr. 20-30.) The ALJ's conclusions are not "patently wrong," *Powers*, 207 F.3d at 435, and the Court will not entertain Bailey's request to reconsider the evidence in the hope that it will be viewed in his favor a second time.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter judgment in favor of the Commissioner and against Bailey.

SO ORDERED.

Enter for December 21, 2009.

S/Roger B. Cosbey           
Roger B. Cosbey,
United States Magistrate Judge
